# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued September 9, 2016        Decided November 15, 2016

No. 15-1145

NTCH, INC.,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

VERIZON,
INTERVENOR

———

On Appeal of Orders of the
Federal Communications Commission

———

*Donald J. Evans* argued the cause for appellant. With him on the briefs was *Ashley Ludlow*.

*Maureen K. Flood*, Counsel, Federal Communications Commission, argued the cause for appellee. With her on the brief were *Jonathan B. Sallet*, General Counsel, *David M. Gossett*, Deputy General Counsel, and *Jacob M. Lewis*, Associate General Counsel. *Richard K. Welch*, Deputy Associate General Counsel, entered an appearance.

*Catherine E. Stetson* argued the cause for intervenor. With her on the brief were *Mary Helen Wimberly*, *William H. Johnson*, and *Katharine R. Saunders*.

Before: PILLARD, *Circuit Judge*, and EDWARDS and RANDOLPH, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: This appeal involves challenges to two orders – referred to herein as the "Memorandum Order" and the "Reconsideration Order" – issued by the Federal Communications Commission ("FCC" or "Commission"). In these orders, the Commission approved the transfer of radio spectrum licenses to Verizon Wireless ("Verizon"), a national telecommunications company, granted Verizon forbearance from a statutory provision, and refused to initiate proceedings to revoke other licenses held by Verizon. Appellant NTCH, Inc., a company that provides wireless phone and internet services, challenges these orders. Verizon has intervened in support of the FCC.

The FCC administers the Communications Act of 1934 (the "Act"). 47 U.S.C. §§ 151 et. seq. As part of its duties, the Commission oversees the assignment and sale of radio spectrum licenses. 47 U.S.C. § 310(d). "Spectrum" is "[t]he range of electromagnetic radio frequencies used in the transmission of sound, data, and television," and is crucial to cell phone companies. *See* GLOSSARY OF TELECOMMUNICATIONS TERMS, https://www.fcc.gov/general/glossary-telecommunications-terms (last visited Oct. 18, 2016). Section 310 of the Act limits who may hold spectrum licenses, and bars or restricts ownership for companies with certain levels of foreign control. In 2012, the

Commission issued a "Forbearance Order" detailing when and how it would refrain from applying section 310(b)(3).

In late 2011, a number of companies seeking to sell spectrum licenses petitioned the FCC to approve the transfer of their licenses to Verizon. The Commission sought public comment on these applications, eventually grouping them together for consideration. In the Memorandum Order, the agency approved a "Spectrum Assignment," authorizing a series of license assignments between various entities, with the greatest share going to Verizon. The agency found that the Spectrum Assignment promised significant public interest benefits, but also threatened some detriments. However, the Commission determined that the potential harms could be offset, and approved the arrangement subject to several conditions. Because Verizon was then governed by section 310(b)(3), the Commission also granted Verizon prospective forbearance from that subsection.

NTCH petitioned for reconsideration and claimed, for the first time, that Verizon had illegally obtained hundreds of spectrum licenses between 2000 and 2012 in violation of section 310(b)(3). NTCH argued that the Commission had unlawfully granted retroactive forbearance under section 310(b)(3) to cover this up, and that proceedings to revoke those licenses must be initiated. NTCH also claimed that the FCC had failed to follow its own standards in granting Verizon prospective forbearance. The FCC rejected all of these claims in the Reconsideration Order.

NTCH now appeals to overturn the FCC's orders. It asserts that the FCC unlawfully granted Verizon retroactive forbearance, that the agency should be required to initiate show cause license revocation proceedings against Verizon, and that the agency's grant of prospective section 310(b)(3) forbearance

violated its own procedures. Additionally, NTCH argues that the Commission's approval of the Spectrum Assignment should be overturned because it is not in the public interest.

We reject NTCH's claims. The FCC's decision not to initiate proceedings to revoke Verizon's licenses is not subject to judicial review. Furthermore, any questions about the licenses Verizon obtained before the Spectrum Assignment are not properly before the court. NTCH's challenge to the FCC's grant of prospective forbearance is moot because no foreign entity now has any ownership of Verizon. Finally, the Commission's determination that the Spectrum Assignment was in the public interest was reasonable and therefore survives arbitrary and capricious review.

## I. Background

### A. *Section 310(b) and Verizon's Ownership Structure*

Section 310 places restrictions on who may own radio licenses, including spectrum licenses. At issue in this case are sections 310(b)(3) and (b)(4). These provisions state that

> No broadcast or common carrier . . . license shall be granted to or held by—
>
> (3) any corporation of which more than one-fifth of the capital stock is owned of record or voted by aliens or their representatives or by a foreign government or representative thereof or by any corporation organized under the laws of a foreign country;
>
> (4) any corporation directly or indirectly controlled by any other corporation of which more than one-

fourth of the capital stock is owned of record or voted by aliens, their representatives, or by a foreign government or representative thereof, or by any corporation organized under the laws of a foreign country, if the Commission finds that the public interest will be served by the refusal or revocation of such license.

47 U.S.C. § 310(b)(3), (4).

The Commission has interpreted section 310(b)(3) to bar possession of a radio spectrum license by an entity in which aliens hold more than a twenty-percent interest, including indirectly through an intervening, U.S.-organized entity that itself does *not* own more than fifty-percent of that licensee. *Request for Declaratory Ruling Concerning the Citizenship Requirements of Sections 310(b)(3) and (4) of the Commc'ns Act of 1934, as amended*, 103 F.C.C. 2d 511, 520–22 ¶¶ 16–19 (1985). Section 310(b)(4) bars possession of spectrum licenses where aliens hold more than twenty-five percent interest in a U.S.-organized entity that *does* control a licensee, but only if the Commission determines that refusing ownership would serve the public interest. 47 U.S.C. § 310(b)(4). In 2012, the Commission issued an order detailing the circumstances in which it would forbear from applying section 310(b)(3), and the procedures it would follow in doing so. *In the Matter of Review of Foreign Ownership Policies for Common Carrier and Aeronautical Radio Licensees Under Section 310(b)(4) of the Commc'ns Act of 1934, as Amended*, 27 FCC Rcd. 9832 (2012).

In 2000, the FCC granted Bell Atlantic (Verizon's predecessor-in-interest) and Vodafone (a foreign company) permission to jointly assign their wireless licenses to Cellco, a U.S.-organized company that does business under the name "Verizon Wireless." *In re Applications of Vodafone AirTouch,*

*PLC and Bell Atlantic Corp.*, 15 FCC Rcd. 16507 (2000). Vodafone initially owned a controlling share in Verizon. Consequently, the FCC evaluated Verizon's eligibility to hold licenses under § 310(b)(4).

At some point after this, however, Vodafone's ownership of Verizon became non-controlling. At that point, Verizon's eligibility to own spectrum licenses should have shifted from being governed by section 310(b)(4) to being controlled by section 310(b)(3)'s absolute prohibition. But between 2000 and 2012, when the Commission granted Verizon forbearance, Verizon obtained a significant number of licenses. In 2014, Verizon bought out Vodafone's interest. As a result, Verizon is now wholly owned by a domestic corporation, and no part of section 310(b) applies to it.

## B. *The Spectrum Assignment and NTCH's Challenge*

In late 2011, the Commission received a number of applications from companies seeking to assign spectrum licenses to Verizon. These transfers would have resulted in Verizon significantly increasing its spectrum holdings in markets across the country. The Commission sought and received public comment on these proposals, and consolidated them for its consideration. NTCH opposed the transfers, asserting that it would harm the public interest.

On August 21, 2012, the Commission adopted its Memorandum Order approving the Spectrum Assignment. *In the Matter of Applications of Cellco P'ship d/b/a Verizon Wireless and SpectrumCo LLC and Cox TMI, LLC for Consent to Assign AWS-1 Licenses*, 27 FCC Rcd. 10698, 10699 ¶ 6 (2012). It determined that the assignments of spectrum licenses to Verizon would, overall, be in the public interest, so long as conditions were imposed to mitigate potential threats to the public interest.

These threats included the dangers of Verizon "warehousing" the spectrum, thereby foreclosing competitor access and leaving the spectrum unused. *Id.* at 10723–24 ¶ 68. The Commission was also aware that the assignments might increase Verizon's market dominance and harm competition. *Id.* at 10711 ¶ 31. To allay these concerns, Verizon committed to quickly develop and make use of the spectrum it would receive, and agreed to transfer a significant amount of spectrum to T-Mobile. *Id.* at 10743–44 ¶¶ 121–22.

The Commission also addressed the issue of "roaming." All wireless carriers are required to provide phone service to people who are outside of their home markets. *See Reexamination of Roaming Obligations of Commercial Mobile Radio Serv. Providers*, 22 FCC Rcd. 15817, 15818 ¶ 1 (2007). To achieve this, providers must negotiate deals with one another in order to ensure continuous service to customers. The Commission does not set the prices that carriers may charge each other for this service, however.

In the Memorandum Order, the FCC acknowledged that small carriers had, in the past, experienced difficulty negotiating roaming arrangements with Verizon, and that the transfer would further enlarge a national telecommunications company that has "little incentive" to negotiate favorable roaming deals with smaller competitors. 27 FCC Rcd. at 10730 ¶ 84, 10742–43 ¶ 120. To address this problem, the FCC required Verizon to agree to comply for five years with a newly adopted rule requiring carriers to offer roaming arrangements on commercially reasonable terms and conditions, even if that rule was overturned on appeal. *Id.* at 10743 ¶ 121. Finally, because Verizon would have been barred from holding licenses under section 310(b)(3), the Commission granted it forbearance from that section.

NTCH petitioned for reconsideration on September 24, 2012. It asserted, for the first time, that the Commission had impermissibly allowed Verizon to acquire and retain hundreds of licenses between 2000 and 2012, in violation of section 310(b)(3). NTCH thus pressed for the agency to initiate an investigation into Verizon's license acquisition and ownership. NTCH also claimed that the FCC had improperly granted retroactive forbearance to Verizon in an attempt to rectify the licensing mistakes made between 2000 and 2012. Finally, NTCH claimed that the FCC failed to follow its own procedures in granting prospective forbearance.

Two and a half years later, the Commission issued its Reconsideration Order denying NTCH's claims. *In the Matter of Applications of Cellco P'ship d/b/a Verizon Wireless and SpectrumCo LLC and Cox TMI, LLC for Consent To Assign AWS-1 Licenses*, 30 FCC Rcd. 3953 (2015). The Commission held that it *had* followed its own forbearance procedures, and that the issue was moot in any event because Verizon had bought out Vodafone's ownership interest in 2014. *Id.* at 3954 ¶ 4, 3956–57 ¶¶ 10–11. In the alternative, the Commission held that the licenses obtained by Verizon prior to the Memorandum Order were not at issue, and that NTCH had not demonstrated why its argument regarding Verizon's ineligibility to obtain those licenses could not have been raised sooner. *Id.* at 3957 ¶ 12. Finally, the FCC declined to initiate show cause revocation proceedings against Verizon. *Id.* at 3957–58 ¶ 13.

NTCH now appeals from the Memorandum Order and the Reconsideration Order, advancing three claims. First, NTCH contends that, because the FCC granted Verizon hundreds of spectrum licenses in violation of section 310(b)(3), and unlawfully granted Verizon retroactive forbearance to justify these prior illegal actions, the Commission should institute revocation proceedings. Second, NTCH asserts that the FCC

violated its own procedures in granting Verizon prospective forbearance, which must be reversed. Finally, NTCH argues that the FCC's approval of the Spectrum Assignment was not in the public interest and, therefore, must be undone.

## II. Analysis

### A. *Standard of Review*

The Commission's orders are subject to reversal if they are arbitrary and capricious. 5 U.S.C. § 706(2)(A). To survive arbitrary and capricious review, an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal quotes and citation removed). A court may not "substitute its judgment for that of the agency," but must instead evaluate whether the agency's decision considered relevant factors and whether it reflects a clear error of judgment. *Id.*

### B. *The Commission's Refusal to Initiate Revocation Proceedings and its Alleged Grant of Retroactive Forbearance Are Not Reviewable*

NTCH claims that the FCC should have initiated proceedings to revoke all of Verizon's licenses issued since 2000 because they were allegedly obtained in violation of section 310(b)(3). It also claims that the Commission unlawfully granted Verizon retroactive forbearance from section 310(b)(3) in order to validate and rectify this mistake. We address these allegations together because the requested remedy is the same: that the Commission be ordered to initiate show cause revocation proceedings against Verizon under 47 U.S.C. § 312.

We reject NTCH's demand for two reasons. First, the Commission's decision not to initiate revocation proceedings is discretionary and thus unreviewable. Although there is a "basic presumption of judicial review" of agency action, *Abbott Labs. v. Gardner,* 387 U.S. 136, 140 (1967), section 701(a)(2) of the Administrative Procedure Act ("APA") bars judicial review of agency actions that are "committed to agency discretion by law," 5 U.S.C. § 701(a)(2). In *Heckler v. Chaney*, 470 U.S. 821, 831 (1985), the Court made it clear "that an agency's decision not to prosecute or enforce, whether through civil or criminal process, is a decision generally committed to an agency's absolute discretion." The Court then went on to hold that "an agency's decision not to take enforcement action should be presumed immune from judicial review under § 701(a)(2)." *Id.* at 832.

The Commission's decision not to initiate revocation proceedings "was equivalent to a decision not to commence an enforcement action" and, thus, presumptively unreviewable. *Drake v. F.A.A.*, 291 F.3d 59, 70 (D.C. Cir. 2002). Issuing a show cause order is the first step towards addressing a violation of section 310(b). *See* 47 U.S.C. § 312(a)(2), (c). The FCC's refusal to do so was thus a decision not to pursue an enforcement action under the Act, and is presumed unreviewable. *See Chaney*, 470 U.S. at 831–32.

This conclusion is reinforced by the terms of the Act. Section 312(a) provides, in seven instances, that "[t]he Commission *may* revoke any station license." 47 U.S.C. § 312(a) (emphasis added). Generally, "[w]hen a statute uses a permissive term such as 'may' rather than a mandatory term such as 'shall,' this choice of language suggests that Congress intends to confer some discretion on the agency." *Dickson v. Sec'y of Defense*, 68 F.3d 1396, 1401 (D.C. Cir. 1995). The simple point here is that the Act "provides the agency broad

discretion in enforcement decisions," *N.Y. State Dep't of Law v. FCC*, 984 F.2d 1209, 1215 (D.C. Cir. 1993), and requires the conclusion that the FCC's decision here is not reviewable. *See Starr v. FCC*, No. 96-1295, 1997 WL 362730, at *1 (D.C. Cir. May 20, 1997) (per curiam) (stating that enforcement decisions under 47 U.S.C. § 312(a) are committed to agency discretion by law).

NTCH attempts to rebut this presumption of unreviewability, but its arguments fail. NTCH asserts that section 312(a) of the Act provides manageable standards by which to evaluate any Commission action taken pursuant to its authority to initiate show cause proceedings. This argument misses the point. Merely because the statute indicates situations with respect to which the agency *may* take enforcement actions does not mean that the agency *must* act in all such situations. Section 312(a) merely states that for each of the cited situations the Commission "may" act to revoke a license, clearly leaving the ultimate decision to the Commission's discretion. Nothing in the statute requires the agency to initiate an enforcement action.

NTCH also points to two prior Commission decisions that it argues require the Commission to initiate revocation proceedings here. *In the Matter of Mario Loredo,* 11 FCC Rcd. 18010 (1996); *In the Matter of KOZN FM Stereo 99, Ltd*., 59 Rad. Reg. 2d (P & F) 628 (1986). But these decisions do not rebut the conclusion that the FCC has full discretion to decide whether to initiate revocation proceedings. Instead, they are merely examples of occasions when the FCC has invoked its enforcement authority.

In summary, the Commission's decision not to initiate revocation proceedings against Verizon was committed to the agency's discretion, and NTCH has not rebutted the presumption of unreviewability. *Chaney*, 470 U.S. 821.

NTCH's claims contesting the FCC's refusal to initiate revocation proceedings and its alleged grant of retroactive forbearance also fail because the matter of Verizon's previously-obtained licenses is not properly before the court. The licenses already held by Verizon were not at issue in the FCC's proceedings below. NTCH did not contest Verizon's eligibility to hold the licenses until it filed a Petition for Reconsideration. And NTCH's claims regarding these licenses are rooted in two innocuous sentences in the Memorandum Order, in which the Commission stated:

> We note that our action today removes any uncertainty as to whether the current foreign ownership of Verizon Wireless, as a common carrier licensee, complies with our foreign ownership policies. We find that Verizon Wireless is qualified under the foreign ownership provisions of Section 310(b) of the Communications Act to hold, in its own right, its current common carrier licenses and the common carrier licenses it is being assigned in the applications being approved today.

27 FCC Rcd. at 10766–67 ¶ 177.

The forgoing statement is dicta, however, entirely unnecessary to the Commission's resolution of the issues that were before it and resolved by the Memorandum Order. It is certainly apparent that the Memorandum Order had the effect of putting to rest any uncertainty about the legality of Verizon's existing licenses; but this did not mean that the legality of the licenses was an issue in the Spectrum Assignment proceeding. *See US West v. FCC*, 778 F.2d 23, 27–28 (D.C. Cir. 1985) (dismissing appeal to FCC order where challenged language was dicta).

In short, we dismiss NTCH's revocation and retroactive forbearance claims because the Commission's refusal to initiate show cause revocation proceedings is unreviewable under *Chaney*. Furthermore, any licenses held by Verizon prior to the Spectrum Assignment were not the subject of the proceedings below, and so NTCH's challenge is not properly before us.

## C.  *NTCH's Prospective Forbearance Challenge is Moot*

NTCH asserts that the Commission's grant of section 310(b)(3) forbearance to Verizon must be overturned because the agency failed to follow its own procedures. We dismiss this claim because it has been mooted by intervening events.

Federal courts are authorized to adjudicate only "actual, ongoing controversies" that are within the jurisdiction of the court. *Honig v. Doe*, 484 U.S. 305, 317 (1988). A live controversy must exist at all stages of judicial review, not only when a complaint is filed. *See Friends of the Earth v. Laidlaw Env. Servs.*, 528 U.S. 167 (2000). "If events outrun the controversy such that the court can grant no meaningful relief, the [claim] must be dismissed as moot." *McBryde v. Comm. to Review Circuit Council Conduct & Disability Orders of the Judicial Conference of the U.S.*, 264 F.3d 52, 55 (D.C. Cir. 2001). That is exactly what has happened with NTCH's claim that the Commission's grant of section 310(b)(3) forbearance violated its own procedural requirements.

As discussed above, section 310(b)(3) bars entities in which aliens have more than a 20% indirect, non-controlling interest from owning spectrum licenses. At the time of the Memorandum Order, Vodafone had a 45% ownership interest in Verizon, and so Verizon's authority to hold radio licenses was governed by section 310(b)(3). In 2014, however, Verizon

bought out Vodafone's interest. Verizon is now wholly owned by a domestic company, and so there is no longer any alien ownership issue.

As a result, the court "can grant no meaningful relief" to NTCH. *Id.* at 55. Even if we were to find that the Commission violated its own procedures and wrongly granted Verizon forbearance, there would be no consequences whatsoever. On remand, the agency could not re-evaluate the question of forbearance because section 310 no longer applies to Verizon.

NTCH asserts that the "voluntary cessation" exception to mootness applies, but that exception has no play in this case.

> As a general rule, a defendant's "voluntary cessation of allegedly illegal conduct does not deprive [a court] of power to hear and determine the case." *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979). Voluntary cessation will only moot a case if "there is no reasonable expectation . . . that the alleged violation will recur" and "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Id.*

EDWARDS, ELLIOTT, & LEVY, FEDERAL STANDARDS OF REVIEW—REVIEW OF DISTRICT COURT DECISIONS AND AGENCY ACTIONS 135 (2d ed. 2013).

The act of "voluntary cessation" to which NTCH points is Verizon's purchase of Vodafone's ownership interest, but NTCH is challenging the FCC's grant of forbearance to Verizon. The FCC did not "voluntarily" terminate that grant. Rather, Verizon's intervening action nullified the FCC's forbearance determination. This situation does not give rise to the voluntary cessation exception to mootness. *See Am. Bar*

*Ass'n v. FTC*, 636 F.3d 641, 648 (D.C. Cir. 2011) (no voluntary cessation where intervening legislation nullified challenged policy statement, because the agency had not acted voluntarily).

**D.  *The Commission's Approval of the Spectrum Assignment Was Not Arbitrary and Capricious***

**1. NTCH has standing to challenge the Spectrum Assignment.**

As an initial matter, Verizon argues that NTCH does not have standing to challenge the FCC's approval of the Spectrum Assignment. We disagree. "To satisfy the requirements of Article III standing in a case challenging government action, [NTCH] must allege an injury in fact that is fairly traceable to the challenged government action, and it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Nat'l Wrestling Coaches Ass'n v. Dep't of Educ.*, 366 F.3d 930, 937 (D.C. Cir. 2004) (internal quotes and citation removed). NTCH has satisfied these requirements.

NTCH contends that the Spectrum Assignment will foster an anticompetitive telecommunications environment because it grants Verizon a vast swath of spectrum to the potential detriment of smaller competitors. NTCH asserts, for example, that under the Spectrum Assignment, it will be more difficult for it to negotiate reasonable roaming arrangements because Verizon holds a disproportionate share of market power. These plausible allegations suffice to show injury to achieve standing under Article III. Indeed, the FCC acknowledged these potential dangers to competition in its Memorandum Order. 27 FCC Rcd. at 10730 ¶ 84, 10742–43 ¶ 120.

NTCH's asserted injury is also causally related to the Commission's approval of the Spectrum Assignment because that decision granted Verizon a significant amount of spectrum in a large number of markets. Finally, redressability is satisfied because a decision reversing the Commission's approval of the Spectrum Assignment would likely lead to Verizon holding fewer spectrum licenses, or the FCC imposing new conditions on the Spectrum Assignment. A party need not demonstrate with certainty that its injury will be redressed, and standing is not defeated by the possibility that an agency might ultimately wield its discretion in a way that does not fix a party's alleged injury. *FEC v. Akins*, 524 U.S. 11, 25 (1998).

Because NTCH has articulated an injury that is traceable to the Commission's order and might be redressed by a favorable decision from the court, it has met the requirements of Article III so as to achieve standing to challenge the Spectrum Assignment.

### 2. The FCC's approval of the Spectrum Assignment survives arbitrary and capricious review.

NTCH's argument that the Spectrum Assignment must be reversed because it is arbitrary and capricious lacks merit. The agency acted reasonably, fairly considered the evidence and arguments before it, and adequately explained its rationale. We therefore reject NTCH's challenge.

Under section 310(d) of the Act, the Commission may approve assignments of licenses upon finding that "the public interest, convenience, and necessity will be served thereby." 47 U.S.C. § 310(d). While the Act itself does not define how the FCC should decide what is in the "public interest," the Supreme Court has stated "that Congress had granted the Commission broad discretion in determining" this, so long as the agency's

determination "is based on consideration of permissible factors and is otherwise reasonable." *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 594 (1981) (internal quotation marks and citation omitted). To that end, we will uphold the Commission's application of the Act's "public interest" standard unless we find it to be arbitrary and capricious. *Transp. Intelligence, Inc. v. FCC*, 336 F.3d 1058, 1064 (D.C. Cir. 2003). In making this assessment, we "evaluate the agency's rationale at the time of decision." *Pension Benefit Guar. Corp. v. LTV Corp.*, 496 U.S. 633, 654 (1990).

The Memorandum Order reflects a reasonable consideration of the evidence, arguments, and issues presented to the Commission. Following its investigation of the issues, the Commission found that approving the Spectrum Assignment would benefit the public interest in a number of ways. Most importantly, the Commission determined that the Spectrum Assignment would enable the development of a large amount of fallow spectrum.

SpectrumCo held the lion's share of the licenses that were transferred to Verizon. SpectrumCo was formed in 2006, and in 2007 it purchased a significant number of spectrum licenses. The company never entered the telecommunications business, however, and so its holdings had not been utilized in any way. The Commission determined that the Spectrum Assignment would provide "significant public interest benefits" by allowing the development of this neglected resource. It also found that the Spectrum Assignment would result in more efficient use of existing spectrum holdings. This, in turn, would benefit both carriers and consumers, as it would enable the companies involved to expand and develop their networks and serve their customers' growing demands.

As part of its analysis, however, the FCC identified three potential risks. First, the agency was concerned that the concentration of spectrum with Verizon would harm competition. Second, the FCC was also concerned that Verizon might warehouse the spectrum, leaving it unused and foreclosing competitor access. Finally, the FCC determined that the transfer might hurt smaller carriers, like NTCH, who are dependent upon other companies to provide roaming capability. The Commission observed that granting Verizon more spectrum would further empower "a nationwide provider that has little incentive" to negotiate roaming arrangements with "competitors with less than national footprints." 27 FCC Rcd. at 10730 ¶ 84.

To mitigate these potential harms, the Commission imposed three conditions to its approval of the Spectrum Assignment. To address the concern over spectrum concentration, the FCC required Verizon to divest a significant number of licenses to T-Mobile. In addition to limiting Verizon's overall and location-specific spectrum holdings, the Commission determined that this would enable T-Mobile to develop its own technology and infrastructure, enabling it to expand the coverage of its network. Second, the Commission remedied the prospect of Verizon hoarding the spectrum by requiring it to follow a timeline for the spectrum's rapid development and use.

Finally, the FCC addressed the issue of roaming in two ways. It required Verizon to agree to abide by the agency's then-new data roaming rule requiring providers to offer roaming arrangements on commercially reasonable terms. At the time of the Memorandum Order, Verizon was challenging the legality of the data roaming rule before this court. *See Cellco P'ship v. FCC*, 700 F.3d 534 (D.C. Cir. 2012) (upholding the rule). Verizon agreed to abide by it, however, even if it were overturned on appeal. In addition, the FCC found that the

transfer of spectrum to T-Mobile would eventually allow T-Mobile to be a roaming alternative to Verizon.

After examining the evidence before it and imposing these conditions, the Commission reasonably determined that the Spectrum Assignment would, overall, serve the public interest.

In challenging the Commission's approval of the Spectrum Assignment, NTCH does not address the bulk of the Commission's analysis, instead focusing solely on the Commission's finding that the Spectrum Assignment could further harm the ability of smaller carriers to obtain data roaming agreements from Verizon. In claiming that the FCC did nothing to ameliorate this problem, NTCH makes two primary arguments.

First, NTCH claims that the data roaming rule had already failed to compel Verizon to offer reasonable roaming rates, and so it was irrational for the Commission to think that requiring Verizon to abide by it would fix the problem. This is an unfair criticism of the rule, however, which had only been in effect for eleven months when the Commission approved the Spectrum Assignment. *See* 76 Fed. Reg. 63561-01 (Oct. 13, 2011). We "evaluate the agency's rationale at the time of decision." *Pension Benefit Guar. Corp.*, 496 U.S. at 654. At the time of decision, it was too early to declare the rule ineffective, especially considering that it was unclear whether the rule would survive legal challenge. The terms of the rule are facially reasonable and the underlying rationale for the rule makes sense.

NTCH next argues that Verizon's divestment of spectrum to T-Mobile could do nothing to resolve the problem because companies that are able to roam on Verizon's network are not able to roam on T-Mobile's network. The two are incompatible. Specifically, T-Mobile uses the "Global System for Mobile

Communications" ("GSM") protocol, whereas Verizon (and NTCH) use the "Code Division Multiple Access" ("CDMA") protocol. Therefore, according to NTCH, T-Mobile could not serve as a roaming alternative for those carriers who had been having difficulty negotiating agreements with Verizon.

This argument appears to raise a legitimate concern, but the issue is not properly before us. Section 405(a) of the Act states that the FCC must be "afforded [an] opportunity to pass" on all arguments made to a court. 47 U.S.C. § 405(a). NTCH admits that it did not explicitly raise with the FCC its argument about the incompatibility of CDMA and GSM carriers. It is true that our precedent construing section 405(a) does not require an argument to be brought up with specificity, but only reasonably "flagged" for the agency's consideration. *Time Warner Entm't. Co. v. FCC*, 144 F.3d 75, 81 (D.C. Cir. 1998). The question here is "whether a reasonable Commission *necessarily* would have seen the question raised before us as part of the case presented to it." *Id.* We think not.

The closest that NTCH came to making the argument was in its petition to deny the Spectrum Assignment. There, it referred to Verizon's dominance among CDMA operators, discussed the difficulties faced by smaller CDMA carriers who must roam with Verizon, and asserted that granting Verizon more spectrum would worsen this situation. But these points were only vague allusions to NTCH's current argument and, therefore, they do not serve to satisfy the requirements of section 405(a). The issue that NTCH now raises was never reasonably flagged for the FCC because no reference was made to T-Mobile in NTCH's petition to deny the Spectrum Assignment.

This case does not involve a situation in which the issue could not have been raised, *see Action for Children's Television v. FCC*, 906 F.2d 752, 755 (D.C. Cir. 1990); nor a situation in

which it would have been futile to raise the issue, *see All Am. Cables & Radio, Inc. v. FCC*, 736 F.2d 752, 761 (D.C. Cir. 1984); nor a situation in which the challenged action is "patently in excess of [the agency's] authority," *Washington Ass'n for Television and Children v. FCC*, 712 F.2d 677, 682 (D.C. Cir. 1983). Therefore, because NTCH did not raise the issue in its petition to deny or in its petition for reconsideration, section 405(a) applies.

In summary, the Commission's approval of the Spectrum Assignment reflects a reasonable consideration of relevant factors. NTCH believes that the FCC's decision was not in the public interest, and that the remedial actions it took to mitigate the threatened public interest harms were inadequate. The Commission, in its expert judgment, disagrees. It is well understood that "[a]gency discretion is often at its 'zenith' when the challenged action relates to the fashioning of remedies." *Towns of Concord, Norwood & Wellesley, Mass. v. FERC*, 955 F.2d 67, 76 (D.C. Cir. 1992) (quoting *Niagara Mohawk Power Corp. v. Fed. Power Comm'n*, 379 F.2d 153, 159 (D.C. Cir. 1967)). For the reasons enumerated above, we cannot say that the Commission's findings and fashioned remedies are arbitrary and capricious. Accordingly, we deny NTCH's challenge.

## III. Conclusion

For the reasons stated above, we reject the claims raised by NTCH in the appeal.

*So ordered.*