# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued February 3, 2017          Decided July 21, 2017

No. 15-1500

NUEVA ESPERANZA, INC.,
APPELLANT

v.

FEDERAL COMMUNICATIONS COMMISSION,
APPELLEE

G-TOWN RADIO, ET AL.,
INTERVENORS

———

On Appeal of an Order of the
Federal Communications Commission

———

*Devi M. Rao* argued the cause for appellant. With her on the briefs were *John L. Flynn* and *Matthew S. Hellman*

*Scott M. Noveck*, Counsel, Federal Communications Commission, argued the cause for appellee. With him on the brief were *Jonathan B. Sallet*, General Counsel, and *Jacob M. Lewis*, Associate General Counsel. *Richard K. Welch*, Deputy Associate General Counsel, entered an appearance.

*Andrew Jay Schwartzman* and *Drew T. Simshaw* were on the brief for intervenors G-Town Radio, et al. in support of appellee.

Before: ROGERS and SRINIVASAN, *Circuit Judges*, and GINSBURG, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* GINSBURG.

GINSBURG, *Senior Circuit Judge*:  Appellant Nueva Esperanza, Inc., a nonprofit corporation based in Philadelphia, Pennsylvania, applied to the Federal Communications Commission in 2013 for a license to construct and operate a Low Power FM Radio (LPFM) station in Philadelphia.  The Media Bureau of the Commission dismissed the Appellant's application.  The Commission affirmed, *LPFM MX Group 304, NAACP Social Justice Law Project, et al.*, *Application for a Construction Permit for a New LPFM Station at Philadelphia, Pennsylvania*, 30 FCC Rcd. 13983 (2015) (the Order), and the Appellant now asks this court to vacate that decision.  We affirm the decision of the Commission.

## I.  Background

In 2000, the Commission introduced the LPFM service "to create opportunities for new voices on the air waves and to allow local groups, including schools, churches and other community-based organizations, to provide programming responsive to local community needs and interests."  *Creation of Low Power Radio Service*, 15 FCC Rcd. 2205, 2213 (2000).  To that end, it limited "eligibility for LPFM licenses … to noncommercial, educational entities and public safety entities."  *Id*. at 2209.  Although the Commission is required to resolve "mutually exclusive" applications by commercial applicants through a competitive bidding process, *id*. at 2213 (citing 47 U.S.C. § 309(j)), the Commission resolves mutually exclusive LPFM applications through a point system, in

keeping with the noncommercial nature of the new service, *id*. at 2258.

Under that system, the Commission gives an applicant one point for each of six characteristics, such as having an "established community presence of at least two years." *Commission Identifies Tentative Selectees in 111 Groups of Mutually Exclusive Applications Filed in the LPFM Window*, 29 FCC Rcd. 10847, 10848 (2014).

Several community organizations, including the Appellant, applied during the October 2013 filing period to construct an LPFM station in Philadelphia, PA. After the Commission identified eleven applications, including that of the Appellant, as mutually exclusive, *Media Bureau Identifies Mutually Exclusive Applications*, 28 FCC Rcd. 16713, 16715 (2013), it awarded five points to each of seven of the applicants, thus creating a seven-way tie, 29 FCC Rcd. at 10857-65 (announcing the "tentative selectees, *i.e.*, the single applicant with the highest point total or the applicants tied for the highest point total from each [mutually exclusive] group," *id*. at 10847). Under the Commission's procedures, 47 C.F.R. § 73.872(c), in order to break a tie "two or more of the tied applicants in each [mutually exclusive g]roup may propose to share use of the frequency by filing … a time-share proposal." 29 FCC at 10852. The Commission then "aggregate[s] the point totals of applicants that submit acceptable time-share proposals." *Id*.

Four of the tied applicants, not including the Appellant, filed a timeshare agreement and received 20 points. This group comprised G-Town Radio, Germantown United Community Development Corp., Germantown Life Enrichment Center, and South Philadelphia Rainbow Committee Community Center, Inc. (collectively, the Timeshare Applicants). The Appellant,

together with another applicant, the Social Justice Law Project of the Philadelphia NAACP, Inc., which had received five points, also filed a timeshare application, thereby receiving ten points. Because their point total was higher, the Timeshare Applicants were awarded the license.

Two months before the Timeshare Applicants filed their agreement, the Appellant and the NAACP Project had petitioned the Commission to deny several applications, including those of three of the Timeshare Applicants, *viz.*, G-Town Radio, Germantown United Community Development Corporation, Germantown Life Enrichment Center, and Historic Germantown Preserved. In its petition to deny, the Appellant argued those four applicants had violated the Commission's rule prohibiting multiple applications, by or on behalf of the same applicant, 47 C.F.R. § 73.3520, alleging that the parties were all acting on behalf of G-Town Radio. The three Germantown applicants in the Timeshare group filed an opposition, claiming they were all independent entities, each of which "pledg[ed] to operate a radio station on their own" but

> recognized their best chance at operating a station dedicated to Germantown was by working together at the outset with plans to potentially aggregate points during the Mutually Exclusive … stage so that they might share time on a single station.

In reply to the opposition, the Appellant argued this pre-application collaboration by the Germantown entities was prohibited according to a blog post authored by William T. Lake, the Chief of the Media Bureau, intended to give guidance to applicants. *Updated: The Low Power FM Application Window Is Fast Approaching*, FCC BLOG (Oct. 21, 2013, 3:13 PM), https://www.fcc.gov/news-events/blog/2013/10/21/updat

ed-low-power-fm-application-window-fast-approaching. The Blog Post provided "reminders and highlights" concerning the application process for the "new low-power FM radio station licenses during the next window, October 15 – November 14, 2013." *Id*. As relevant to this case, Mr. Lake noted:

> Third, we will permit organizations in a community to work together to file a single … application. Alternatively, organizations in a community could apply separately – for the same or different frequency – knowing that they may decide later to aggregate points so they can negotiate a time-share agreement if the Commission determines that they are tied with the highest point total in the same mutually exclusive group …

> Fourth, please bear in mind that it is the *specified* applicant on the application who must intend to carry out the station construction and operation described in the application. Therefore, multiple groups should not attempt to maximize the chances of receiving an LPFM construction permit by submitting multiple applications under the different groups' names with a prior understanding that the groups will later share time or ownership with each other if just one applicant succeeds in getting a construction permit. If this prior understanding does exist, then all the applicants must be listed as parties to the application, and only one application can be filed (our rules only allow for one application per organization). The FCC requires applicants to be truthful when listing all the parties that have control over the applicant entity and, in the event the application is granted, would have control over the future LPFM station.

*Id*. We shall refer to these two paragraphs as the Third and Fourth Paragraphs.

The Media Bureau responded to the timeshare applications and petitions to deny in a single decision, in which it granted the application of the Timeshare Applicants, dismissed the applications of the Appellant and others, and denied the Appellant's petition to deny the applications of the four Germantown applicants. The Bureau concluded the Appellant and the NAACP Project, its timeshare partner, "have not demonstrated that the Germantown Applicants violated any [of the Commission's rules] in coordinating their applications with the intention of filing a joint time-share agreement or that the applications were filed for the benefit of G-town." First, the Bureau found no evidence of "common control of the Germantown Applicants as a group," noting that each had an "independent corporate history and independent board," and also noting the inclusion of a non-Germantown applicant, South Philadelphia, in the final timeshare group and the exclusion of Historic Germantown, one of the alleged colluders. The Bureau went on to say "there is no Rule prohibiting LPFM applicants from filing separate applications with the goal of arriving at a timeshare agreement, provided that each applicant remains under separate control and intends to construct and operate the proposed station if its application is granted." The Bureau also observed that the Third Paragraph of the Blog Post had "specifically approved of such agreements," adding that the Appellant's

> selective quotation from the Commission's Blog ignores that coordinated applications from multiple applicants were prohibited only in cases where there is "a prior understanding that the groups will later share time or ownership with each other if just one applicant succeeds in getting a construction permit."

The Appellant petitioned the Media Bureau for reconsideration, which the Timeshare Applicants opposed. The Bureau denied reconsideration, once again concluding "that the Time-Share Applicants' filing of separate applications and aggregation of points were consistent with the relevant portion of the Blog Post." The Bureau explained that the Appellant had misinterpreted the Blog Post:

> Aggregation is explicitly limited by rule to "tied applicants" with "the same point total" whereas [the Appellant and its co-petitioner] rely on a portion of the blog directed at circumstances where "just one applicant succeeds in getting a construction permit," *e.g.*, a single applicant with the most points nevertheless has previously committed to allow others to share time even if the others would be eliminated due to fewer points or other problems.

The Appellant sought review by the Commission, which the Commission denied for the reasons given by the Bureau: "Neither the [Commission's rules] nor the LPFM Blog Post prevented the Germantown Applicants from agreeing to aggregate their comparative points prior to filing their applications." 30 FCC Rcd. 13983, 13983.

## II. Analysis

The question presented by the Appellant is whether the Blog Post prohibits timesharing arrangements between LPFM applicants before tentative selectees are announced. Because we conclude the Appellant's interpretation of the Blog Post is not correct, we affirm the Commission's denial of the Appellant's application for review without reaching the

Appellant's claim that the Blog Post – as the Appellant interprets it – is binding upon the agency.

## A. The Commission's Interpretation of the Blog Post

Under the Administrative Procedure Act, we are to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A). Although we defer to an agency's interpretation of its own regulation if it is not "plainly erroneous or inconsistent with the regulation," *Auer v. Robbins*, 519 U.S. 452, 461 (1997) (internal quotation marks omitted), "it is the court that ultimately decides whether a given regulation means what the agency says." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1208 n.4 (2015).

The Appellant argues the Blog Post said entry into timesharing arrangements was prohibited before the filing of parties' applications, and until the Commission has announced the points awarded to each applicant.  For this, the Appellant relies upon the Fourth Paragraph of the Blog Post, insofar as it states:

> [M]ultiple groups should not attempt to maximize the chances of receiving an LPFM construction permit by submitting multiple applications under the different groups' names with a prior understanding that the groups will later share time or ownership with each other if just one applicant succeeds in getting a construction permit.

The Commission argues, as the Media Bureau said, that the arrangement here was consistent with the Third Paragraph, which provides:

> [O]rganizations in a community could apply separately – for the same or different frequency – knowing that they may decide later to aggregate points so they can negotiate a time-share agreement if the Commission determines that they are tied with the highest point total in the same mutually exclusive group.

Therefore, per the Commission, the Appellant's proposed interpretation of the Fourth Paragraph would make it inconsistent with the Third Paragraph.

The Appellant discounts the Commission's reading of the Third Paragraph, arguing that paragraph merely "explains that parties are obviously allowed to *know* that the LPFM licensing regime allows for aggregation of points upon the awarding of tied point totals to multiple applicants." According to the Appellant, the Fourth Paragraph instead prohibits applications from parties that have entered into a "preexisting agreement to share points." In other words, according to the Appellant, "know[ledge] that [the applicants] may decide later to aggregate points," as permitted by the Third Paragraph, is different from "a prior understanding that the groups will later share time," which is prohibited by the Fourth Paragraph.

This distinction is seemingly irrelevant considering the Commission's determination that the record does not show the Germantown applicants entered into any sort of binding agreement. Passing that point, we agree with the Commission that the Appellant's distinction between "concrete agreements to share points" (prohibited) and "discussions" of future plans (permitted) cannot be drawn from the Blog Post and would be difficult to enforce. As the Commission persuasively explains, the phrase in the Third Paragraph, "knowing that they may decide later to aggregate points," alludes to the Commission's

requirement that timeshare agreements may be filed only after "tentative selectees" are announced by the Commission.

Next, the Appellant contends a prohibition of timeshare arrangements before tentative selectees are announced is implicit in the Commission's regulations requiring applicants to submit timeshare agreements only after that announcement. As the Commission points out, however, the reason for this requirement is simply that "[i]t would make little sense to allow premature submission of time-sharing arrangements that may turn out to be invalid if one of the parties is found ineligible to participate."

As the Media Bureau stated in its denial of the petition for reconsideration, the Appellant's interpretation also requires us to ignore the phrase in the Fourth Paragraph, "if just one applicant succeeds in getting a construction permit." According to the Commission, the Fourth Paragraph merely "forbids agreements that would allow an organization that does *not* qualify as a tentative selectee (and thus is not eligible to receive the license or to participate in any time-sharing arrangement) to nonetheless share in a winning applicant's airtime." The Commission argues this interpretation must be understood in light of the last sentence, which states "applicants [must] be truthful when listing all the parties that have control over the applicant entity and, in the event the application is granted, would have control over the future LPFM station"; that disclosure would not be necessary if, as in this case, each party to a timesharing agreement also had applied separately and was listed in the agreement as a group member. We agree.

The Appellant, however, argues the Commission's interpretation is implausible because "when 'just one applicant succeeds in getting a construction permit,'" that one applicant

must have received the highest point total and anticipated with certainty that it would do so, thus leaving "no way for [a] prior agreement between the parties to 'maximize the chances of receiving an LPFM construction permit.'" The Commission convincingly responds that the award of points is not always a straightforward exercise, citing several disputes in LPFM licensing matters to show the award of points is not as predictable as the Appellant assumes. Because applications are also often rejected for technical reasons and applicants cannot always predict who will be placed in a "mutually exclusive" group, the Commission persuasively argues that a sole winning applicant could have rationally sought to "maximize" its chances by entering into an agreement with others at some point before tentative selectees are announced.

Finally, the Appellant contends its reading of the Blog Post is more sensible than the Commission's because allowing agreements to aggregate points before tentative selectees are announced would invite "gamesmanship." Here, it argues, the Germantown applicants "stack[ed] the deck in their favor … virtually ensur[ing] they would win the license from the outset"; only the Appellant's reading would "level[] the playing field for a strong applicant like Esperanza that applied in good faith, to ensure that [it] is not shut out of the process," and would give "*all* of the tied entities a shot at teaming up with others to amass the most aggregated points."

The point is not without some merit. In its 2012 Report and Order the Commission acknowledged "the potential for gamesmanship in the voluntary timesharing process," but decided to stick with that process because "it is one of the most efficient and effective means of resolving mutual exclusivity among tied LPFM applicants." *Creation of a Low Power Radio Service, Sixth Report & Order*, 27 FCC Rcd. 15402, 15474 (2012). Had the Commission committed in 2012 to

reducing gamesmanship at all costs, then the Commission's rejection of the Appellant's interpretation of the Blog Post would seem anomalous and, if unexplained, perhaps arbitrary and capricious. But the Commission struck a balance, accepting the risk of some gamesmanship in order to encourage voluntary resolutions. *Id*. The time for objecting to that determination has long since passed. *See* 47 U.S.C. § 402.

In sum, the Appellant has given us no reason to think the Commission's interpretation of the Blog Post is arbitrary and capricious. Therefore, we need not reach the question whether the Blog Post is binding upon the Commission.

**B. Fair Notice**

The Appellant also argues it did not have fair notice of the Commission's interpretation of the Blog Post. *See, e.g., Satellite Broad. Co. v. FCC*, 824 F.2d 1, 4 (D.C. Cir. 1987). We agree with the Commission that the Appellant has forfeited this argument.

To preserve the argument for appellate review, the Appellant was required to present it to the Commission in its application for review of the Media Bureau's decision. 47 U.S.C. § 405(a). *See, e.g.*, *Bartholdi Cable Co. v. FCC*, 114 F.3d 274, 279 (D.C. Cir. 1997) ("It is 'the Commission' itself that must be afforded the opportunity to pass on the issue"). The Appellant argues it did present the argument in its application for review when it argued that it would have tried to make a similar timesharing agreement "[h]ad the policy on pre-application and pre-mutually exclusive phase agreements to aggregate points and agree to timeshare agreements been clear."

That submission did not raise the issue of "fair notice" with sufficient clarity to require the Commission to pass upon it. The quoted passage appears at the end of a section entitled "The Bureau Unlawfully Addressed a Novel Question of Law or Policy in its July Order," in which the Appellant argued the Media Bureau "exceeded its authority" under a Commission regulation, 47 C.F.R. § 0.283(c), providing that the Chief of the Media Bureau does not have authority to decide "[m]atters that present novel questions of law, fact or policy that cannot be resolved under existing precedents and guidelines." In denying review, the Commission disagreed on the point the Appellant did argue, stating: "The Bureau's determination that the applicable rules do not prohibit the subject agreement between the Germantown Applicants fell squarely within [its] authority." 30 FCC Rcd. 13983, 13983 n.10.

The question of forfeiture *vel non* under § 405(a) is "whether a reasonable Commission *necessarily* would have seen the question raised before us as part of the case presented to it." *NTCH, Inc. v. FCC*, 841 F.3d 497, 508 (D.C. Cir. 2016) (internal quotation marks omitted). Here, the Appellant argued the Media Bureau had exceeded its authority, not that it had deprived the Appellant of fair notice regarding the meaning of the Blog Post. Therefore the Commission had no chance to pass upon the issue of fair notice and the issue is not properly before the court.

## III. Conclusion

Because the Appellant's interpretation of the Blog Post is incorrect and it forfeited its argument regarding fair notice, the decision of the Commission is

*Affirmed*.